JOSEPH L. FONTANA *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. TLD BUILDERS, INC., Defendant (Nicola DiCosola, Defendant-Appellant and Cross-Appellee).

Second District   No. 2—05—0045

Opinion filed December 14, 2005.

Terry A. Ekl and Vincent C. Mancini, both of Connolly, Ekl & Williams, P.C., of Clarendon Hills, for appellant.

William T. Dwyer, Jr., of O'Rourke, Hogan, Fowler & Dwyer, of Chicago, for appellees.

JUSTICE KAPALA delivered the opinion of the court:

Defendant-appellant and cross-appellee, Nicola DiCosola (DiCosola), appeals the $1,271,816.10 judgment entered against him personally in the circuit court of Du Page County after a trial without a jury. DiCosola contends that the trial court erred when it pierced the corporate veil of defendant, TLD Builders, Inc. (TLD), and held him personally liable for the obligations of the corporation. Plaintiffs-appellees and cross-appellants, Joseph L. Fontana and Angela D. Fontana (the Fontanas), cross-appeal, contending that the trial court erred in failing to grant their motion for attorney fees. For the reasons

that follow, we reject DiCosola's appellate contentions and affirm the trial court's judgment against DiCosola personally. In the cross-appeal, we reverse that portion of the trial court's order denying the Fontanas' request for attorney fees, and we remand the cause.

## I. BACKGROUND

This lawsuit was originally filed on September 4, 2001, naming as defendants TLD[1] and architect Stanley L. Glodeck.[2] On July 16, 2003, the Fontanas were given leave to file an amended complaint naming DiCosola as an additional defendant. In the amended complaint filed on July 30, 2003, the Fontanas alleged that they owned a parcel of real property commonly known as 347 Ruby Street, Clarendon Hills, Illinois (the property). The Fontanas alleged further that on September 24, 1999, they and TLD entered into a written construction contract in which TLD agreed to construct a single-family residence (the home) on the property for the sum of $1,475,800. In count I of the amended complaint, the Fontanas sought a declaration that they were excused from further performance of their obligations under the construction contract, as a result of TLD's material breach of the construction contract. In count II of the amended complaint, the Fontanas alleged that TLD breached the terms of the construction contract by failing to construct the home in accordance with the construction contract and by abandoning all work on the home in February 2001, leaving the home incomplete and uninhabitable. As a result of the breach, the Fontanas alleged, the costs and expenses necessary to correct the defects and deficiencies in the construction performed by TLD, and to complete the construction of the home, exceeded the fair market value of the home had it been completed in accordance with the architect's drawings. The Fontanas alleged further that, as of September 2002, the home had no value and could not be economically repaired or completed, so it was demolished in November 2002. As a result of the damages due to the breach, the Fontanas prayed for a judgment against TLD in an amount in excess of $2 million, and also prayed for interest, costs, and reasonable attorney fees.

In count III of the amended complaint, the Fontanas alleged that the architect breached the terms of the contract that he entered into with the Fontanas. In count IV of the amended complaint, titled "Piercing the Corporate Veil," the Fontanas alleged that DiCosola was

---

[1]At the time the lawsuit was originally filed, TLD was named TLD Enterprises, Inc. It changed its name to TLD Builders, Inc., following the filing of this lawsuit.

[2]The Fontanas ultimately settled with Stanley L. Glodeck and dismissed their claim against him before trial.

the alter ego of TLD and is thereby liable for the damages sought from TLD in count II of the amended complaint. The Fontanas alleged further that since the commencement of the instant lawsuit against TLD, DiCosola has caused TLD to cease its business operations such that the corporation has no funds or income with which to compensate them for the damages resulting from the breach of the construction contract. The Fontanas alleged that adherence to the fiction of the separate corporate existence of TLD would promote injustice by denying them any recovery of the losses resulting from the direct actions of DiCosola.

At the conclusion of the bench trial of this cause, the trial court held that TLD materially breached the construction contract and failed to cure the breach. The trial court also found that the evidence was sufficient to establish that the amount of money the Fontanas paid to TLD, together with the cost to complete the unfinished home according to the plans and specifications referenced in the construction contract, would exceed the $2.2 million value of the home were it completed pursuant to the plans and specifications. As such, the trial court held that it was appropriate under the circumstances to demolish the unfinished home, and it calculated the Fontanas' damages to be $1,271,816.10. The trial court entered judgment in that amount in favor of the Fontanas and against TLD and DiCosola, jointly and severally.

The trial court's determination that TLD materially breached the construction contract and its calculation of the resulting damages have not been challenged on appeal. Instead, DiCosola contends that the trial court erred in piercing the corporate veil and holding him personally liable for the obligations of TLD. As such, we discuss only the evidence presented at trial that is necessary to the disposition of DiCosola's appeal.

The Fontanas called Theresa DiCosola, who testified that she believed that she and DiCosola, her husband, were equal owners of TLD until she learned that a corporation's president is not equal to a corporation's director. When asked if she was the incorporator of TLD, Theresa said, "[w]hatever my lawyer did." Theresa did not recall the date that TLD was incorporated, how many shares TLD issued, or the amount paid for the shares. After reviewing the articles of incorporation, Theresa recalled that she incorporated TLD and that 1,000 shares were issued to her at a price of $1 per share. Theresa agreed that on January 26, 2004, the date she gave her deposition in the instant case, she did not know that she was the sole shareholder of TLD. When asked if she wrote a $1,000 check to TLD for the 1,000 shares of TLD stock, the following exchange ensued:

"[THERESA]: I did check that with my lawyer and he did say that a thousand dollars was for a thousand shares.

[PLAINTIFFS' COUNSEL]: Did you write a check to TLD Enterprises for a thousand dollars?

[THERESA]: From what I understand, a thousand dollars went in the company to start it.

[PLAINTIFFS' COUNSEL]: That's not my question.

[THERESA]: Well, the money was taken from our personal account.

[PLAINTIFFS' COUNSEL]: The question is, did you write a check to TLD Enterprises—

[THERESA]: Well, I am going to say yes.

[PLAINTIFFS' COUNSEL]: Okay. Fine. Do you have the check?

[THERESA]: I have moved three or four times. I really don't—I didn't realize I had to save all of these personal checks from my personal account, so I am going to say no.

[PLAINTIFFS' COUNSEL]: Well, when is it that you remembered that you wrote a check to TLD Enterprises?

[THERESA]: Actually, I talked to my lawyer after the deposition, Bob Borla, because I did not—I remember signing papers, but it wasn't as though I remembered how it came about.

[PLAINTIFFS' COUNSEL]: Well, during your deposition, you didn't remember whether you wrote a check for a thousand dollars; and you said you would have to check your checkbook and find out. Did you check your checkbook?

[THERESA]: I told you, I don't have any—do not have any of the return[ed] checks.

[PLAINTIFFS' COUNSEL]: So the only knowledge you have about paying for the stock of the company is what your lawyer told you?

[THERESA]: Yes.

[PLAINTIFFS' COUNSEL]: And who is that lawyer?

[THERESA]: Robert Borla. He said we did it in the office."

Theresa also testified that she signed the annual corporate minutes of TLD as sole shareholder and director, but she said that DiCosola handled all the financial matters related to TLD. Theresa said that she and DiCosola loaned money to TLD in the past, including 13 loans in 1999. She did not know how the money was transferred into the company because she did not handle the financial end of the operation. Theresa testified that she did not know that TLD owed her $572,000 as of December 31, 2002, but she testified that the $572,000 loaned to TLD came from her and DiCosola's personal account. At the time of her deposition, Theresa did not know that TLD was a "subchapter S corporation," what a K-1 form was, or whether she ever

received a paycheck from TLD. Theresa said that she has never received a dividend from TLD and did not know if TLD had profits or losses in the years 1998, 1999, 2000, 2001, and 2002. However, Theresa did sign TLD's income tax returns for those years. Theresa admitted that TLD reported $1,818,213 in assets as of January 1, 2002, and zero assets as of December 31, 2002. Theresa did not know where the assets went.

Theresa testified further that she, DiCosola, and their lawyer decided who the officers of TLD would be. It was a running joke in her family that she owned the company, that "mom was the boss." Theresa said that she and DiCosola decided together what properties to purchase to build speculative (spec) homes on, and that she relied on her husband to determine the sale prices. Theresa acknowledged that resolutions of the board of directors of TLD, of which she is the only director, showed that TLD sold seven properties for prices totaling $3,234,000 between October 29, 2001, and February 4, 2002, but that she did not participate in deciding the selling prices of those properties and did not know the amounts TLD received for the properties. Theresa denied paying her and DiCosola's personal bills through TLD, and then the following exchange ensued:

"[PLAINTIFFS' COUNSEL]: Let me ask you, if you were asked this question and gave this answer at your deposition on page 7 starting at line three:

'Do you receive a paycheck from any business?

Answer: Do I receive a paycheck? I didn't receive—we pay our bills that way through the business, but I never—there was never a paycheck in my name.' Were you asked the question and did you give that answer?

[THERESA]: You asked the question and I answered it. I was very nervous.

[PLAINTIFFS' COUNSEL]: As a matter of fact, Mrs. DiCosola, you don't know how funds are deposited in your joint checking account; do you?

[THERESA]: No.

[PLAINTIFFS' COUNSEL]: You don't know where the money comes from?

[THERESA]: I know that we cut a check from the business."

Theresa testified further that TLD has never had any employees and does not pay a salary to anyone. Theresa and DiCosola have no sources of income other than TLD, and DiCosola has worked exclusively for TLD since 1998. When asked where she and her husband got money to live on if they did not draw salaries or wages from TLD and the company had net losses in excess of $1 million from 1998 through 2002, Theresa said they lived off the proceeds of the sales of two personal homes that they "did very well on."

During questioning by counsel for DiCosola, Theresa said that her duties with respect to TLD were office work, filing, answering the telephone, babysitting children when they would come into the office, cleaning, and doing all the "spec work." By "spec work" Theresa meant selecting the windows, roofs, brick, cabinetry, floors, paint, moldings, lighting, and appliances for the spec homes that TLD built. Theresa testified that TLD is still in existence. Theresa explained that TLD never paid her and DiCosola's personal mortgage, electric bill, or gas bill but, rather, they have always paid those bills through their personal account and never through the business.

The Fontanas also called DiCosola, who testified that he is the president of TLD. He acknowledged that TLD has never had an employee. He said that TLD is in the business of building homes as a general contractor. TLD was the general contractor on the Fontana home at 347 Ruby Street in Clarendon Hills. DiCosola said that he has never had a written contract with a subcontractor and never takes bids from subcontractors. DiCosola agreed that he never issues written change orders to his subcontractors and does not keep written work schedules for projects because "the job pretty much tells itself how to run it." TLD keeps no financial records for any payments that it makes except for draw schedules filed with title companies. DiCosola kept no written records of the changes the Fontanas requested to be made to the home. DiCosola explained that there was no need to keep records of the changes because none of the money went through TLD. DiCosola testified that he has no record of the cash the Fontanas paid to him for changes made to the home, and no records of any payments made to any subcontractors performing the work on the changes. DiCosola explained that any money given to him by the Fontanas for changes was forwarded to the subcontractors who performed the work. DiCosola admitted that he has another company, NTK Enterprises. NTK has built two spec homes since the instant lawsuit was filed; one has been sold. DiCosola admitted that TLD went from approximately $1.8 million in assets on January 1, 2002, to zero assets on December 31, 2002. When asked where the $1.8 million went, DiCosola said that it went to pay down the money borrowed on the line of credit to build the properties that were sold. DiCosola related that TLD's 2002 federal income tax return showed $1,472,388 in liabilities in the form of mortgages, notes, bonds, and payables; $388,157 in other liabilities; and $663,989 in liabilities in the form of loans from shareholders.

The Fontanas successfully moved into evidence TLD's filings with the Illinois Secretary of State's office and TLD's stock certificate. These documents indicated that TLD was incorporated on November

10, 1998, and that Theresa was the sole shareholder. Other documents admitted into evidence showed shareholder action appointing DiCosola as president and secretary of TLD. The tax returns of TLD showed a loss of $182 in 1998, a loss of $203,403 in 1999, a profit of $139,765 in 2000, a loss of $451,997 in 2001, and a loss of $254,042 in 2002.

After considering all the evidence, and finding the breach of contract and resulting damages in the amount mentioned above, the trial court held that DiCosola's status as a nonshareholder of TLD did not preclude holding him liable for the obligations of TLD pursuant to the equitable remedy of "piercing of the corporate veil." The trial court found this court's decision in *Macaluso v. Jenkins*, 95 Ill. App. 3d 461 (1981), instructive on the issue. The trial court noted that in *Macaluso* this court affirmed a personal judgment against the chairman of the board of a not-for-profit corporation even though not-for-profit corporations do not have shareholders. With respect to the factors used to determine whether piercing the corporate veil is appropriate, the trial court found that the following factors weighed in favor of piercing the corporate veil: inadequate capitalization of TLD (the trial court determined that Theresa's testimony regarding the $1,000 check "cast doubt" on whether any initial capitalization occurred), failure to observe certain corporate formalities, failure to pay dividends, operation of the corporation without a profit, commingling of corporate and personal assets, a nonfunctioning officer or director in Theresa, insolvency of the corporation, and absence of corporate records. The trial court found that the actual issuance of stock was the only factor that weighed in favor of not piercing the corporate veil. Based on the foregoing, the trial court ruled as follows:

"I think that all of these factors taken together are clear and convincing that Mr. DiCosola is the dominant force behind this corporation, that the corporation is little more than a shell which was established to shield him from liability. I think the fact that he signed the contract with his own individual signature in two places, while it is certainly not dispositive, its just one more indication that this business is Mr. DiCosola and that the corporation in the words of the Macaluso case should be disregarded and the veil of limited liability pierced because it would be an obstacle to the protection of private rights and because the corporation is merely the alter ego or business conduit of Mr. DiCosola who is the governing and dominating personality in this business enterprise.

For that reason, I will find that Mr. DiCosola is the alter ego of the business, that TLD Enterprises is a business conduit of his dominating personality so that the judgment will enter against Mr. DiCosola personally and against the corporation jointly and severally in the amount that I set forth before and that will be a final order."

DiCosola timely appeals and the Fontanas cross-appeal. TLD has not appealed.

## II. ANALYSIS

### A. DiCosola's Appeal

■ A corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who generally are not liable for the corporation's debts. *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 526 (2002). A primary purpose of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity. *Peetoom*, 334 Ill. App. 3d at 526. Limited liability will ordinarily exist even when the corporation is closely held or has a single shareholder. *Peetoom*, 334 Ill. App. 3d at 526. "However, a court may disregard a corporate entity and pierce the veil of limited liability where the corporation is merely the alter ego or business conduit of another person or entity." *Peetoom*, 334 Ill. App. 3d at 527. This doctrine imposes liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business. *Peetoom*, 334 Ill. App. 3d at 527. "Such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation." *Peetoom*, 334 Ill. App. 3d at 527. "The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract." *Peetoom*, 334 Ill. App. 3d at 527.

"A party seeking to pierce the corporate veil has the burden of making 'a substantial showing that one corporation is really a dummy or sham for another' [citation], and courts will pierce the corporate veil only reluctantly [citation]." *In re Estate of Wallen*, 262 Ill. App. 3d 61, 68 (1994). We employ a two-prong test in order to determine whether to pierce the corporate veil: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *People ex rel. Scott v. Pintozzi*, 50 Ill. 2d 115, 128-29 (1971); *Wallen*, 262 Ill. App. 3d at 68-69. A reviewing court will not reverse the finding of the trial court regarding piercing the corporate veil unless it is against the manifest weight of the evidence. *Wallen*, 262 Ill. App. 3d at 68; *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 796 (1993).

1. *Imposition of a Liability of a Corporation on a Nonshareholder*
DiCosola's first appellate contention is that the trial court erred in

finding him personally liable under a veil-piercing theory because no Illinois authority allows piercing the corporate veil to impose liability on a nonshareholder. Because he was never a shareholder in TLD, DiCosola maintains, the "unity of interest and ownership" element of piercing the corporate veil was not satisfied. We reject this contention.

In *Macaluso*, this court rejected the argument that because the defendant, who was the chairman of the board and treasurer of a not-for-profit corporation, did not and could not own shares in the not-for-profit corporation, he could not be held liable for the corporation's debt. *Macaluso*, 95 Ill. App. 3d at 465. We noted that the "unity of interest and ownership" requirement of piercing the corporate veil could not technically be met. *Macaluso*, 95 Ill. App. 3d at 465. However, after noting further that the equitable remedy of piercing the corporate veil looks to substance rather than form (*Macaluso*, 95 Ill. App. 3d at 465), we concluded that "even though [the defendant] did not and could not own shares of [the not-for-profit corporation], he did exercise ownership control over the corporation to such a degree that separate personalities of [the corporation and the defendant] did not exist, and that [the corporation] was a business conduit of [the defendant]." *Macaluso*, 95 Ill. App. 3d at 466. Contrary to DiCosola's contention, *Macaluso* is Illinois authority for holding a nonshareholder liable for a corporation's debts through the equitable remedy of piercing the corporate veil.

■ We disagree with DiCosola's characterization of our holding in *Macaluso* as applying an exception to the rule of stock ownership because the plaintiffs sought the piercing of a not-for-profit corporation's veil as opposed to an ordinary corporation's veil. The bases of our holding in *Macaluso* for imposing the liability of the corporation upon the nonshareholder defendant were his exercise of ownership control over the corporation such that their separate personalities did not exist and that the corporation was a business conduit of the defendant. *Macaluso*, 95 Ill. App. 3d at 465-66.

Our holding in *Macaluso* is consistent with the decisions of courts in other jurisdictions that have considered the issue and have concluded that equitable ownership in a corporation, demonstrated by control exercised by an individual sought to be held liable for corporate debts, may satisfy the "unity of interest and ownership" element of piercing the corporate veil. See *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (applying New York law, held that "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner', notwithstanding the fact that the individual is not a

shareholder of the corporation"); *Lally v. Catskill Airways, Inc.*, 198 A.D.2d 643, 645, 603 N.Y.S.2d 619, 621 (3d Dep't 1993) (nonshareholder defendant may be, "in reality," the equitable owner of a corporation where the nonshareholder defendant "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute"); *In re MacDonald*, 114 B.R. 326, 332-33 (D. Mass. 1990) (piercing the corporate veil in bankruptcy case to establish debtor as the equitable owner of corporate stock that ostensibly was owned by debtor's father, and therefore finding stock subject to turnover order); *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.*, 187 Conn. 544, 556-57, 447 A.2d 406, 412 (1982) ("[S]tock ownership, while important, is not a prerequisite to piercing the corporate veil but is merely one factor to be considered in evaluating the entire situation. Similarly, we have never required that an individual be an officer or director of the pierced corporation in order to hold him liable for the debts of the corporation. It is clear that the key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs. [Citations.] Thus, while the usual case does involve a director, officer or shareholder of a corporation, the lack thereof, in an unusual case such as this, would not prevent us from imposing liability upon an individual by piercing the corporate veil if the evidence demonstrated the requisite level of control and otherwise satisfied the instrumentality or other applicable test"); *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F. Supp. 1355, 1366 n.13 (S.D.N.Y. 1978) (declining to find that under no set of circumstances could defendant husband be shown to be an alter ego of corporation simply because 100% of the corporation's stock was held in his wife's name instead of his).

The only case law DiCosola cites in support of his argument that he cannot be held liable under a veil-piercing theory because he is not a shareholder is *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994). *Hystro Products* does not so hold. In *Hystro Products*, the creditor of a subsidiary corporation sought to pierce the corporate veil of the subsidiary corporation and hold the parent corporation liable for the debt of its subsidiary corporation. *Hystro Products*, 18 F.3d at 1386. In discussing the "unity of interest and ownership" element of piercing the corporate veil, the court in *Hystro Products* wrote: "Stock control and the existence of common officers and directors are *generally* prerequisites to the piercing of the corporate veil although these factors alone will not suffice." (Emphasis added.) *Hystro Products*, 18 F.3d at 1389. The foregoing is a recogni-

tion that where the alleged alter ego of a parent corporation is the subsidiary corporation, stock ownership by the parent is ordinarily one of the elements that is required to show unity of interest and ownership. However, *Hystro Products* is not authority for the proposition that the alter ego of a corporation can never be a nonshareholder. Cases involving parent and subsidiary corporations will not address the issue of whether actual stock ownership is *always* required to meet the "unity of interest and ownership" element of piercing the corporate veil. This is because, by definition, a parent corporation is a corporation that has working control of the subsidiary corporation through stock ownership. See 18 Am. Jur. 2d *Corporations* § 41 (2004). Consequently, the issue of establishing the "unity of interest and ownership" element through equitable ownership rather than through actual ownership of stock did not arise in *Hystro Products*.

Consequently, based on the foregoing, we reject DiCosola's first appellate contention. We hold that DiCosola's status as a nonshareholder in TLD does not preclude piercing TLD's corporate veil and imposing personal liability upon DiCosola for TLD's liability to the Fontanas.

### 2. *The Propriety of Piercing TLD's Corporate Veil*

DiCosola's second appellate contention is that the trial court's decision to pierce TLD's corporate veil was against the manifest weight of the evidence because the Fontanas failed to make a substantial showing as to each prong of the piercing test. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, or not based on the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

### a. "Unity of Interest and Ownership" Prong

In determining whether the "unity of interest and ownership" prong of the piercing-the-corporate-veil test is met, a court generally will not rest its decision on a single factor, but will examine many factors, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088 (1996); *Estate of Wallen*, 262 Ill. App. 3d at 69.

DiCosola argues that the trial court's findings as to inadequate capitalization, the failure to observe corporate formalities, the non-functioning of other officers or directors, the absence of corporate records, and the commingling of funds were against the manifest weight of the evidence. DiCosola does not challenge the trial court's findings that TLD's insolvency and failure to pay dividends weighed in favor of piercing the corporate veil, and he makes no argument regarding the above-marked (2), (9), (10), and (11) factors.

The consideration of whether a corporation is adequately capitalized is based on the policy that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities. *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 959 (2001). It is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability. *Fiumetto*, 321 Ill. App. 3d at 959. "To determine whether a corporation is adequately capitalized, one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Fiumetto*, 321 Ill. App. 3d at 959.

With respect to the adequacy of TLD's initial capitalization, the trial court did not find credible Theresa's testimony that she wrote a $1,000 check from her personal checking account to purchase 1,000 shares of TLD stock in 1998 when TLD was incorporated. In light of Theresa's failure to produce any record of this claimed initial capital contribution to TLD, we cannot say that the trial court's finding that TLD was not capitalized at its inception was unreasonable, arbitrary, or not based on the evidence; nor is the opposite conclusion clearly evident. The evidence demonstrates that at her deposition on January 26, 2004, Theresa indicated that she would obtain a copy of her cancelled check showing the $1,000 capital contribution to TLD. Yet at trial eight months later, Theresa failed to produce the check or a reasonable explanation of her failure to do so. "An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control." *Berlinger's, Inc. v. Beef's Finest, Inc.*, 57 Ill. App. 3d 319, 325 (1978). In an effort to show adequate capitalization, DiCosola directs us to the loans made to TLD by DiCosola and Theresa, and the $4 million line of credit TLD had at a bank. This does not demonstrate adequate capitalization but, rather, shows the inadequacy of TLD's capitalization and indicates that the initial capitalization, if any, was insufficient to conduct TLD's business of building homes as a general contractor. See *Fiumetto*, 321 Ill. App. 3d at 959-60. Also as evidence of adequate capitalization, DiCosola points to spec homes that he claims TLD has owned over the years. However, there is no claim that these homes were ever

unencumbered assets of TLD. Thus, the trial court's finding that TLD was inadequately capitalized was not against the manifest weight of the evidence.

DiCosola also argues that because the Fontanas had every opportunity to investigate the financial status of TLD before hiring TLD to build their home, undercapitalization is a less significant factor. It is true that undercapitalization is less significant in a contract case, where the claim arises from a consensual transaction, than in a tort case, where there is no voluntary dealing. See *Fiumetto*, 321 Ill. App. 3d at 960-61. Nevertheless, assuming without deciding that DiCosola did nothing to conceal from the Fontanas that they were contracting with TLD and not him personally, we do not believe that the diminished significance of the undercapitalization factor renders against the manifest weight of the evidence the trial court's ultimate determination based on the all of the appropriate factors.

With respect to TLD's failure to observe corporate formalities, the trial court based its finding that this factor weighed in favor of piercing the corporate veil on two criteria: (1) TLD's failure to attach the legal descriptions of the properties sold to the corporate resolutions resolving to sell those properties, and (2) the absence of corporate resolutions authorizing notes to be paid to the DiCosolas to satisfy the loans the DiCosolas purportedly made to TLD. DiCosola's sole contention is that absolutely no authority supports the trial court's conclusion that the failure to include the legal descriptions of the properties with the corporate resolutions resolving to sell those properties amounts to a failure to observe corporate formalities. DiCosola does not challenge the second basis and, because the second basis alone is sufficient to support the trial court's finding, we need not address further DiCosola's contention regarding this factor.

With respect to the "nonfunctioning of the other officers or directors" factor, the trial court found that the evidence did not show that Theresa was active as a director or officer of TLD, that Theresa's testimony established that she had no real decision-making role in TLD, and that her role was the selection of amenities for the spec homes and other *de minimis* tasks. DiCosola argues that Theresa was a functioning director of the corporation, contending that he and Theresa shared responsibility for the business operations of TLD, with DiCosola playing the greater role in the home-building process. DiCosola argues that Theresa was an active participant in deciding what properties to purchase and what types of homes to build on the properties, as well as functioning as TLD's office manager and spec home designer.

We believe that the evidence supports the conclusion that Theresa

did not function as an active director of TLD. Specifically, prior to the instant litigation, Theresa did not know that she was the sole shareholder in TLD and its sole director. Rather, Theresa thought that she and DiCosola were co-owners and directors of TLD. When asked about her knowledge of the corporate records she signed, Theresa testified that she signed whatever her lawyers told her to sign. Theresa had no idea how much money was loaned to TLD, and she had no knowledge of a $532,000 loan allegedly owed to her. Theresa also lacked knowledge of how funds were deposited into her and DiCosola's personal checking account, but knew that the money came from the business. The only decisions that Theresa claimed to have made that were arguably significant were decisions made in conjunction with DiCosola concerning what properties to purchase for the purpose of building spec homes. Even if such decisions are the type that a corporate director would make, the trial court found that Theresa had no real decision-making role in TLD and, as finder of fact, it was the trial court's role in a bench trial to assess the credibility of witnesses (*In re Application of the County Treasurer & ex officio County Collector*, 131 Ill. 2d 541, 549 (1989)). As such, it was the trial court's prerogative to dismiss Theresa's testimony regarding her decision-making role in TLD as not credible if it saw fit to do so. Based on the foregoing, we cannot conclude that the trial court's finding that Theresa was a nonfunctioning director was against the manifest weight of the evidence.

Although DiCosola notes that TLD filed corporate bylaws, prepared resolutions and shareholder actions, filed all necessary paperwork with the Secretary of State, filed all tax returns, and maintained a separate bank account and financial records, the evidence of TLD's failure to keep and maintain corporate records is legion. There were no corporate resolutions whatsoever regarding the loans DiCosola and Theresa made to TLD or the terms of these loans. In fact, there are no corporate records of the shareholder loans listed on TLD's tax returns, no notes or other evidence of claimed indebtedness, and no evidence of repayment of any indebtedness. Moreover, despite DiCosola's claim that all of the proceeds from the sales of TLD's assets in 2002 went to repay TLD's indebtedness, there are no corporate records of the amounts borrowed by TLD to purchase the properties and build the homes sold. Additionally, DiCosola admitted he has never had a written contract with a subcontractor, never takes bids from subcontractors, never issues written change orders to his subcontractors, does not keep written work schedules for projects, and keeps no financial records for any payments that TLD makes except for draw schedules filed with title companies. Consequently, the trial

court's determination that TLD failed to keep and maintain corporate records was not against the manifest weight of the evidence.

DiCosola argues further that there was absolutely no evidence that TLD's funds or assets were ever commingled or that the monies earned by the company were diverted to DiCosola and Theresa. We disagree. Theresa testified that TLD has never had any employees and does not pay a salary to anyone. TLD's income tax returns for the years 1998 through 2002 reflect that no salary or wages were paid to anyone and that no compensation was paid to any corporate officer. Thus, neither DiCosola nor Theresa received any wages, salary, or compensation of any kind from TLD. Theresa also testified that she never received a dividend from TLD, and she admitted that she had testified earlier that she never received a check from TLD for anything. However, Theresa also testified that she had no idea how funds were deposited into her and DiCosola's personal checking account, but she knew that they "cut a check from the business." As such, funds from TLD's accounts went into DiCosola and Theresa's personal checking account. This money was not salary, wages, dividends, or distributions and, therefore, demonstrates the commingling of TLD's funds with DiCosola and Theresa's personal funds. From this and other evidence presented at trial, the trial court could have reasonably concluded that the funds or assets of TLD were commingled with the personal funds and assets of DiCosola and Theresa. Thus, the trial court's finding as to this factor was not against the manifest weight of the evidence.

In sum, DiCosola's arguments have not convinced us that, with respect to the first prong of the test utilized to determine if piercing a corporate veil is appropriate, the trial court's judgment was against the manifest weight of the evidence.

### b. "Fraud, Injustice, or Inequitable Consequences" Prong

The second prong of the test used to determine if piercing a corporate veil is appropriate is that circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Pintozzi*, 50 Ill. 2d at 128-29; *Wallen*, 262 Ill. App. 3d at 68-69. The second prong has been described further as "[s]ome element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest." *Berlinger's, Inc.*, 57 Ill. App. 3d at 324; *Wallen*, 262 Ill. App. 3d at 68-69. Actual fraud is not necessarily a predicate to piercing the corporate veil; limited liability may be discarded to prevent injustice or inequitable consequences. *Central States, Southeast & Southwest Areas Pension Fund v. Gaylur Products, Inc.*, 66 Ill. App. 3d 709 (1978).

Although the trial court did not specifically address the second prong of the piercing test, we find that it was satisfied in this case. The trial court could reasonably conclude from the evidence presented at trial that DiCosola caused TLD to be incorporated and placed nominal ownership and control solely in the hands of Theresa for the purpose of shielding himself personally from the liabilities to which his general contracting activities might expose him. As we explained above, the evidence established that, although Theresa was the sole shareholder and sole director of TLD, the trial court found that she was not acting as a director of TLD and that TLD was merely an alter ego of DiCosola. Moreover, once DiCosola's general contracting activities led to a lawsuit and the possibility of a substantial judgment against TLD was evident, DiCosola began selling off TLD's assets to the detriment of TLD's potential judgment creditors, the Fontanas. This lawsuit was filed on September 4, 2001. TLD began the year 2002 with approximately $1.8 million in assets and ended the year with no assets. DiCosola argues that no evidence was introduced to show that TLD's assets were transferred or dissipated to avoid paying a judgment. We disagree.

Although DiCosola claimed that the $1.8 million realized by TLD from the sale of assets in 2002 went to pay down the money borrowed on their line of credit to build the homes sold, there was no proof of that claim other than his testimony. If DiCosola's testimony was accurate, then TLD realized no profit on any of those properties. The fact that TLD operated for five years and realized a profit in only one of those years, while at the same time DiCosola and Theresa received no salaries or distributions from TLD and had no other sources of income, casts doubt on DiCosola's position that TLD was a viable corporation. In addition, TLD's income tax return for 2002 shows that part of the purported corporate debt that was paid off with proceeds from the sale of TLD's assets was a portion of a $663,989 loan that the shareholder made to TLD. More specifically, TLD paid Theresa $91,783 in 2002 as payback of a purported shareholder loan at a time when TLD was being sued by the Fontanas for over $2 million. We find this problematic because, as noted by the trial court, there were no corporate records showing the terms of any shareholder loans. This was an inequitable circumstance in view of the impending $1.2 million liability TLD would owe to the Fontanas. In addition, after this lawsuit was filed, DiCosola began building homes under the newly formed NTK, Inc. There was no explanation for this maneuver other than to keep assets out of TLD and, consequently, beyond the reach of any judgment the Fontanas might secure against TLD. Based on this evidence, the trial court could reasonably conclude that DiCosola

eliminated the assets of TLD to the detriment of TLD's eventual creditors.

■ In sum, we are not convinced that the trial court's judgment with respect to the second prong of the piercing test was against the manifest weight of the evidence. Accordingly, we conclude that the trial court's decision to pierce the corporate veil of TLD was not against the manifest weight of the evidence. Consequently, we affirm the trial court's order entering judgment against Nicola DiCosola personally.

### B. The Fontanas' Cross-Appeal Regarding Attorney Fees

Following the entry of judgment in their favor, the Fontanas filed a "motion for award of costs and attorney's fees." In their motion, the Fontanas prayed for $32,302.89 in expenses paid to various home inspectors, engineers, and architects in connection with their effort to identify construction defects in the home; $16,262.95 in fees for expert testimony presented at trial; and $209,823.99 in attorney fees the Fontanas paid with respect to their attempts to have construction completed and to the instant litigation. The Fontanas relied upon section 10F of the construction contract, which provides:

> "To the extent Builder or Purchaser fails to comply with provisions of this Contract, the other party may retain an attorney to assist it in the enforcement of the provisions of this Contract, and the party at fault (i.e., not in compliance with the provisions of this Contract), shall pay any and all reasonable expense relating to the enforcement of the provisions of this Contract."

After the issue was briefed and argued, the trial court granted the Fontanas' motion in part, and denied it in part, ruling as follows:

> "I think, under the American rule, the—any provision regarding attorney's fees which is in derogation of the common law has to be specifically spelled out. I think this provision is ambiguous, and I don't believe it clearly states that the parties are entitled to attorney's fees or any expenses other than what by case law is determined to be expenses in a suit which is filed. I'm going to deny the petition for attorney's fees. I will allow expenses relating to the filing and service and expenses that are applicable under the Illinois statute and case law."

In their cross-appeal, the Fontanas contend that the trial court erred in finding that section 10F of the construction contract was ambiguous, because its plain meaning leaves no doubt that the parties intended the recovery of attorney fees. The Fontanas argue that because section 10F references the retention of an attorney to assist in the enforcement of the contract and, in the same sentence, assigns the party not in compliance with the contract "any and all reasonable

expenses relating to enforcement," no reasonable person executing the construction contract would understand that they would not have to pay attorney fees upon their breach of the contract. In response, DiCosola argues that because section 10F does not include the term "attorney fees," the term "reasonable expense" cannot be expanded to include attorney fees. Alternatively, DiCosola argues that the failure to include the term "attorney fees" renders section 10F ambiguous and that it should be construed against the Fontanas, as it was their attorney who drafted that portion of the construction contract.

■ "Illinois generally follows the 'American Rule': absent statutory authority or a contractual agreement between the parties, each party to litigation must bear its own attorney fees and costs[, and may not recover those fees and costs] from an adversary." *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 572 (2000). A court may not award attorney fees as a matter of contractual construction in the absence of *specific* language. *Thread & Gage Co. v. Kucinski*, 116 Ill. App. 3d 178, 186 (1983); *Qazi v. Ismail*, 50 Ill. App. 3d 271, 273 (1977). In this case we are called upon to decide whether section 10F of the construction contract, by sufficiently specific language, overrides the "American Rule" and allows the Fontanas to recover their reasonable attorney fees. The construction of a contract presents a question of law that we review *de novo*. *FTI International, Inc. v. Cincinnati Insurance Co.*, 339 Ill. App. 3d 258, 259 (2003).

DiCosola has not directed us to any authority in support of his argument that use of the precise term "attorney fees" in the contractual provision is required to meet the specific language requirement. To be sure, the Illinois cases addressing this issue require a high level of specificity, but they stop short of holding that use of the term "attorney fees" is required. See *Thread & Gage Co.*, 116 Ill. App. 3d at 186; *Qazi*, 50 Ill. App. 3d at 273; see also *Boulevard Bank National Ass'n v. Philips Medical Systems International*, 827 F. Supp. 510, 511 (N.D. Ill. 1993) (rejecting contention that under Illinois law a court may not award attorney fees based upon a contractual provision not specifically mentioning "attorney fees"). Although it is clearly the preferable practice to employ the term "attorney fees" when expressing the parties' intent to override the "American Rule" through a contractual agreement, Illinois law does not require use of the specific term "attorney fees" in order to do so.

We are then left with the issue of whether the language "any and all reasonable expense relating to enforcement" in section 10F specifically includes attorney fees. Under the rules of contract construction, the determinative factor is the intention of the parties, which can best be determined by considering the contract as a whole, reviewing each

part in light of the others. *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002); *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 266 Ill. App. 3d 1070, 1080 (1994). Based on the whole of the language used in section 10F, we believe that the language "any and all reasonable expense relating to enforcement" specifically includes attorney fees. We conclude that whatever else "any and all reasonable expenses related to enforcement" includes, it is sufficiently clear that those expenses include amounts paid to an attorney retained "to assist it in the enforcement of the provisions of [the] contract."

To better understand our conclusion, it is useful to split section 10F into two parts. The first part provides: "To the extent Builder or Purchaser fails to comply with provisions of this Contract, the other party may retain an attorney to assist it in the enforcement of the provisions of this Contract ***." The second part provides: "the party at fault *** shall pay any and all reasonable expense relating to the enforcement of the provisions of this Contract." In view of the fact that no contractual provision is necessary to grant a party the right expressed in the first part, there is no reason to include the language in the first part other than to specify that such expense is recoverable from the party at fault. A contrary construction renders the first part of section 10F meaningless in violation of the principle that requires that a contract be construed such that none of its terms are regarded as mere surplusage. See *Premier Title Co.*, 328 Ill. App. 3d at 166-67. Simply put, the first part of section 10F describes one type of expense (the retention of an attorney to assist in the enforcement of the contract) that, under the second part of section 10F, relates to the enforcement of the provisions of the contract and that the party at fault is required to pay. Read any other way, the first part of section 10F becomes surplusage. Thus, we hold that the only reasonable way to read section 10F is as an expression of the intent of the parties to require the party who fails to comply with the provisions of the construction contract to reimburse the other party for attorney fees incurred to enforce the provisions of the construction contract. Because we disagree with the trial court's conclusion that section 10F is ambiguous, we cannot construe section 10F against the drafter as DiCosola invites us to do.

For the foregoing reasons, we reverse that portion of the trial court's December 16, 2004, order denying the Fontanas' request for attorney fees. We remand this cause and direct the trial court to determine what portion of the requested attorney fees are reasonable and to award them to the Fontanas.

## III. CONCLUSION

Based on the forgoing, we affirm the personal judgment entered

against Nicola DiCosola in the circuit court of Du Page County. However, we reverse the portion of the circuit court's order denying the Fontanas' request for attorney fees, and we remand the cause with directions.

Affirmed in part and reversed in part; cause remanded with directions.

BOWMAN and BYRNE, JJ., concur.