In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1351, 12-1430

ON COMMAND VIDEO CORPORATION,

*Plaintiff-Appellee*,

*v.*

SAMUEL J. ROTI,

*Defendant-Appellant*.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 03130—**Robert W. Gettleman**, *Judge*.

ARGUED SEPTEMBER 14, 2012—DECIDED JANUARY 14, 2013

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. On Command Video (OCV) supplies equipment and licenses software for in-room entertainment in hotels, motels, and resorts. Its equipment and software enable the guests to watch movies on demand and to play games on the television set in their room. OCV has obtained a judgment, in this diversity suit governed by Illinois law, for $641,959.54 against Samuel Roti, the owner of companies (now defunct) named

Markwell Hillside, LLC, and Markwell Properties, LLC; they were the real owner and the pretend owner of a hotel to which OCV provided video services. Roti appeals, at the same time advising us that he thinks we lack appellate jurisdiction.

OCV has two claims against him. The first is that he is personally liable for Markwell Properties' debts to OCV, particularly a $261,058.31 judgment debt for breach of contract that OCV obtained by default against Markwell Properties (which has no assets) in a 2007 state court proceeding in Colorado—an amount to which the district judge added $288,411.22 in post-judgment interest at the 1.5 percent monthly rate specified in the contract plus $92,490.01 in attorneys' fees and costs, to yield the $641,959.54 figure. OCV thus wants Markwell Properties' "corporate veil" "pierced" and the owner made liable for his company's debt to OCV. Although Markwell Properties is not a corporation, a limited liability company is similar and the parties assume that the same standards for piercing the veil, or at least approximately the same standards (see, e.g., Charles W. Murdock, "Liability Stemming from Piercing the Entity Veil," 7 *Business Organizations* § 5:11 (*Illinois Practice Series*, 2012 Supp.)), apply to both types of enterprise.

OCV's second claim, related but distinct, is that Roti fraudulently induced OCV to do business with the assetless Markwell Properties. The relation lies in the fact that the grounds for piercing a corporate veil are fraud or kindred forms of wrongful conduct. In *Hystro Products, Inc. v. MNP Corp.*, 18 F.3d 1383, 1390 (7th Cir.

1994), we gave, as examples of such kindred forms, cases in which failure to pierce the corporate veil would "unfairly enrich one of the parties; allow a parent corporation, that had created a subsidiary's liabilities and was the cause of the subsidiary's inability to meet them, to escape responsibility; allow former partners to ignore obligations; or uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities in an asset-free corporation." But in this case, as we'll see, there is a fraud claim that is distinct from the veil-piercing claim.

The district judge granted summary judgment for OCV on its first claim, thus allowing the company to enforce against Roti the judgment it had obtained in Colorado against Markwell Properties. The judge denied OCV's motion for summary judgment on the separate fraud claim, however, noting that there were triable issues concerning what was said during the contract negotiations and whether OCV's reliance on the alleged representations was reasonable.

Later the judge dismissed that claim with leave to refile it if we reverse the judgment on the veil-piercing claim. Because OCV seeks the same damages under both claims, it has nothing to gain from pursuing the separate fraud claim if its veil-piercing claim prevails in this court. But that was no reason for the judge to dismiss the fraud claim rather than let it pend until and unless we affirm his ruling upholding the veil-piercing claim. Dismissals with leave to refile are unexceptionable when, for example, the dismissal is without prejudice

because of a remediable omission from the complaint. But the dismissal of OCV's fraud claim was not of that character, because it was not based on any deficiency in the claim. Realistically the claim was dismissed not with leave to refile but with leave to reinstate. Such dismissals can create jurisdictional and statute of limitations problems, and so "we have repeatedly criticized the practice of dismissing suits before they have been concluded, with leave to reinstate the suit." *Goss Graphics Systems, Inc. v. DEV Industries, Inc.*, 267 F.3d 624, 626 (7th Cir. 2001). We reiterate that it is a practice to be avoided.

Apparently the parties and the judge thought that by dismissing the fraud claim the judge had made the award of damages on the veil-piercing claim a final judgment and therefore automatically appealable. Not so; "a decision is not final for purposes of appellate jurisdiction if the court rendering it has dismissed one or more of the plaintiff's claims, or one or more of the defendants, with leave to refile." *Arrow Gear Co. v. Downers Grove Sanitary District*, 629 F.3d 633, 636 (7th Cir. 2010). So when Roti appealed from the damages award we dismissed the appeal and the district judge then re-issued the award as a partial final judgment under Fed. R. Civ. P. 54(b); such judgments are appealable immediately, just as if they were completely final. But Roti argues that the veil-piercing and fraud claims overlap so completely that they can't be regarded as separate claims, and a claim must be separate for its disposition in a Rule 54(b) judgment to count as a "final decision" and thus be appealable under 28 U.S.C. § 1291. *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1175 (7th Cir. 1990).

The practical test for whether two claims are separate so that an appealable final judgment can be entered on one of them is the degree of factual overlap. If it were very great in this case, then if we reversed and sent the case back and OCV prevailed on its fraud claim and Roti again appealed we would have to relearn the same facts, maybe years later—a wasteful duplication of our earlier efforts. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 518 F.3d 459, 463-65 (7th Cir. 2008); *Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 515-16 (7th Cir. 2002); *Jordan v. Pugh*, 425 F.3d 820, 826-27 (10th Cir. 2005). But although the question is close, we think the facts underlying the two claims in OCV's suit are sufficiently distinct to have authorized the district judge to enter as he did a final, appealable judgment resolving one of them. OCV's other claim—the claim it will reactivate in the district court should it strike out in this appeal—turns on whether Roti made fraudulent representations during the contract negotiation to induce OCV to sign the contract, whether OCV relied upon the representations, and what damages it would be entitled to (possibly including punitive damages) as a result of that reliance. Those are not issues in this appeal.

We come at last to the merits of the appeal. In 2002 Markwell Hillside bought a Holiday Inn near Chicago (Holiday Inn Hillside, it is called) from a company named 4400 Frontage Road, LLC, which then dissolved. The Holiday Inn had been a customer of OCV when owned by 4400 Frontage Road, LLC, and the new owner, Markwell Hillside, continued the relationship. In 2004 OCV asked the Holiday Inn for a new contract because OCV was

changing over to a new system for distributing its videos that would require the installation of different equipment. In preparation for signing the new contract OCV checked a Dun & Bradstreet database to verify the existence and state of incorporation of the counterparty, but, apparently unaware that Markwell Hillside had purchased the hotel from 4400 Frontage Road, LLC, ran the check on the latter company and was unable to find it in the database. OCV told the manager of the hotel (not Roti himself, who was the owner of both Markwell companies, but rather a subordinate of Roti) that there was a problem, but didn't say what it was. The manager misunderstood OCV to mean that it didn't want Markwell Hillside to be its counterparty because that firm had poor credit. So Markwell Properties, another company Roti owned, was substituted for Markwell Hillside in the contract. But though it is shown in the contract as the owner of the hotel, ownership was never transferred to it from Markwell Hillside, which also continued to manage the hotel. So nothing had changed as far as ownership and operation of the hotel were concerned.

Markwell Properties' only relation to the hotel before its substitution into the OCV contract had been to lease some vans for the hotel's use. The reason for Roti's having placed the leases in a different entity from the hotel owner, Markwell Hillside, had been to shield Markwell Hillside from liability should a van have an accident resulting in a tort suit; Markwell Properties had no assets to speak of.

OCV accepted the substitution of Markwell Properties for Markwell Hillside on the video-services contract

without running a credit check on Markwell Properties or asking Roti or anyone else about its solvency. OCV merely verified that Markwell Properties was indeed the company listed under that name on the records of the Illinois secretary of state. OCV continued sending its invoices to the hotel rather than to either Markwell Hillside or Markwell Properties, and the invoices continued to be paid by checks signed by Markwell Hillside drawn on Markwell Hillside's bank.

But just a few days after the new contract was signed, Markwell Hillside declared bankruptcy. OCV was on notice of the bankruptcy when "D.I.P." (debtor in possession) began appearing on Markwell Hillside's checks to OCV. But it was unfazed. Eventually a trustee in bankruptcy was appointed, took over the operation of the Holiday Inn from Markwell Hillside, and after some months sold it. The trustee had paid OCV's invoices and the new owners of the hotel continued paying them—until they had a falling out with OCV and refused to assume its contract and OCV ceased dealing with the hotel. That was in 2007, two years after the declaration of bankruptcy. OCV never filed a claim in the bankruptcy. It couldn't have done so without a different kind of veil piercing from what it has attempted, because it had no contractual relation with Markwell Hillside.

After the hotel was sold, OCV must have realized that Markwell Hillside had never transferred ownership of it to Markwell Properties. No one suggests that the trustee in bankruptcy acted *ultra vires* in selling the hotel. It had been owned by Markwell Hillside and he was

the trustee in bankruptcy of Markwell Hillside and so controlled that company's assets. Markwell Properties had merely been the other party to OCV's contract to provide video services.

It was when the new owners refused to assume Markwell Properties' contract with OCV that OCV sued Markwell Properties in Colorado (pursuant to the contract's forum selection clause) for breach of contract and obtained the default judgment for $261,058.31 that we mentioned earlier. (That was the amount of the early-termination fee promised in the contract plus other expenses that OCV attributed to Markwell Properties' breach of the contract.) The present suit, filed in the federal district court in Chicago on the basis of diversity jurisdiction, seeks to enforce the judgment that OCV obtained in Colorado. But it seeks to enforce it against Roti rather than against Markwell Properties since the latter has no assets, and indeed has been dissolved. OCV argues that by substituting the assetless Markwell Properties for Markwell Hillside, Roti unjustly shielded assets from a creditor and received personal benefits, primarily in the form of his salary as "sole manager" (as he describes himself without contradiction by OCV) of Markwell Hillside.

The parties agree that Illinois law governs the substantive issues in the appeal—veil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced, *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012) (Illinois law); *Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 700 (7th Cir. 2010), and Markwell Properties is organized

under the laws of Illinois. Illinois allows the corporate veil to be pierced—which is to say exposes the corporation's owner to personal liability for the corporation's debts—if two conditions are satisfied: (1) The owner has failed to operate it as a corporation, neglecting such requisites of the corporate form as adequate capitalization, election of directors and officers, and separation of corporate from personal funds; and (2) refusing to pierce the veil would "sanction a fraud or promote injustice." *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, *supra*, 674 F.3d at 751-57; *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775-76, 778, 781-82 (Ill. App. 2005). (The examples from our *Hystro* opinion that we quoted earlier were all examples of piercing the corporate veil under Illinois law.)

Only the second condition is at issue. The first unquestionably was satisfied. Markwell Properties was inadequately capitalized—it had only $1000 in capital, too little to satisfy even a tort judgment resulting from a minor accident involving one of its vans. It appears to have commingled its revenue with that of Markwell Hillside, which in addition paid Markwell Properties' liabilities on both the van lease and the video-services contract. Markwell Properties didn't keep records and doesn't appear to have had corporate officers. See, e.g., *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519, 521, 524-25 (7th Cir. 1991).

Whether adherence to the fiction of Markwell Properties' corporate separateness would "promote injustice" is a vague test. But it is best understood as asking whether there has been an abuse of limited liability, as when

the owner of a party to a contract strips the party of assets so that if it breaks the contract the other party will have no remedy. *Wachovia Securities, LLC v. Banco Panamericano, Inc., supra*, 674 F.3d at 756; *Hystro Products, Inc. v. MNP Corp., supra*, 18 F.3d at 1390; *Fontana v. TLD Builders, Inc., supra*, 840 N.E.2d at 781-82; *Fiumetto v. Garrett Enterprises, Inc.*, 749 N.E.2d 992, 1005 (Ill. App. 2001); *Melko v. Dionisio*, 580 N.E.2d 586, 595 (Ill. App. 1991). The district judge thought piercing Markwell Properties' veil to reach Roti was proper because Roti had "used [Markwell Properties] to avoid contractual responsibilities, specifically those in the Van Lease and [the video services contract with OCV]."

But by substituting assetless Markwell Properties for Markwell Hillside on the contract Roti did not shield his *personal* assets from OCV or other creditors; he shielded Markwell Hillside's assets. It was Markwell Hillside that OCV should have sued, seeking to pierce the veil between the two Markwell companies on the theory that they were really a single business enterprise whose assets were in one of the constituent companies and whose liabilities were in the other. That is a permissible form of piercing the veil (call it "sideways piercing"—piercing to reach a sister company rather than a parent or other owner). *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 201 (7th Cir. 1988); *Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 102 (Ill. 1981); see also *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000) (Illinois law); *NetJets Aviation, Inc. v. LHC Communications LLC*, 537 F.3d 168, 176-77 (2d Cir. 2008); *In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 335 (5th Cir. 2007); *Gartner v. Snyder*, 607

F.2d 582, 586-88 (2d Cir. 1979); 1 William M. Fletcher, *Cyclopedia of the Law of Corporations* § 43 (2012); Stephen B. Presser, *Piercing the Corporate Veil* § 1:9, pp. 69-71 (2011 ed.). Had OCV obtained its breach of contract judgment against Markwell Properties earlier, before Markwell Hillside's trustee had sold the hotel, it would have had an especially compelling case for piercing the veil between the two Markwell entities so that it could participate in Markwell Hillside's bankruptcy as a judgment creditor.

OCV's unsecured claim against a bankrupt mightn't have been worth much (we'll return to this point). But without proof that Roti personally benefited by using Markwell Properties to shield Markwell Hillside from possible suit by OCV, there is no authority to hold him personally liable for the Markwell entities' debts. *Walkovsky v. Carlton*, 223 N.E.2d 6, 8-9 (N.Y. 1966). Markwell Hillside paid Roti a salary—he ran the company. But as the amount of the salary is not in the record, it can hardly be assumed to have been excessive, in which event part of it (the excessive part) would have been in reality a dividend rather than salary. It's unlikely that Markwell Hillside overpaid Roti. The company was in bankruptcy but was allowed to continue paying him his salary until the hotel was sold. The creditors would have complained about an excessive salary—complained that it (or at least part of it) either was a dividend paid to a shareholder or an unreasonable administrative expense. 11 U.S.C. § 503.

Limiting liability, which is to say shielding the personal assets of shareholders (or their equivalent,

"members" of a limited liability company) from the creditors of their corporation, provides an important incentive for making equity investments. But it is also important for creditors to be able to evaluate the risk of nonpayment by their debtors. And so a corporation that misrepresents the assets available to repay its creditors opens the door to the creditors to go against the corporation's shareholders, Frank H. Easterbrook & Daniel R. Fischel, "Limited Liability and the Corporation" 52 *U. Chi. L. Rev.* 89, 112 (1985), or against a corporate affiliate that is holding assets that appeared to be owned by the corporation that had signed the contract. What makes OCV's attempt to pierce the veil a non-starter is that the defendant is not holding assets that OCV expected to be available to pay the hotel's debt to it.

Apart from OCV's having gone after the wrong party's assets there is a question whether it was justified in relying on Markwell Properties' *having* assets. There is no fraud or injustice, hence no basis for piercing a corporate veil, without reliance by the would-be piercer. See, e.g., *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994); *Semande v. Estes*, 871 N.E.2d 268, 271 (Ill. App. 2007). A creditor will not be heard to complain about having extended credit to an assetless corporation if he knew or should have known it was assetless. *Main Bank of Chicago v. Baker*, *supra*, 427 N.E.2d at 102; *Fusion Capital Fund II, LLC v. Ham*, *supra*, 614 F.3d at 701. OCV could have run a credit check on Markwell Properties, could have required submission of the company's balance sheet certified by a reputable accountant, could have insisted that Markwell Hillside, or for that

matter Samuel Roti, guarantee any debts to OCV that Markwell Properties might owe it. It did none of these things. And when it discovered shortly after signing the contract that Markwell Hillside, which was continuing to pay OCV's invoices, was in bankruptcy (for remember that Markwell Hillside's checks to OCV were now marked "debtor in possession"), it made no effort to protect itself from the possible consequences. It can hardly have thought the bankruptcy irrelevant even if it had thought Markwell Hillside was no longer the owner of the Holiday Inn—it was still being paid by Markwell Hillside. More important, the premise of the bankruptcy had to be that Markwell Hillside, not Markwell Properties, owned the Holiday Inn, for if Markwell Hillside was the debtor in possession of the hotel it must own it, and the trustee in Markwell Hillside's bankruptcy could not have sold the Holiday Inn unless Markwell Hillside owned it.

OCV is a very large company. It sells its video services to thousands of hotels, motels, and resorts. One or more of them must go broke from time to time. But OCV would have no reason to fear disastrous consequences when that happened, given the number of customers over which such a risk is spread. It had no large fixed investment in the Holiday Inn Hillside that might have been impaired in a bankruptcy. Apparently the risk of a customer's bankruptcy was not sufficiently ominous to motivate OCV to make the slightest effort to determine how the risk of a default would change as a result of the substitution in the contract of Markwell Properties for 4400 Frontage Road, LLC (effectively, for Markwell Hillside).

It's not as if Markwell Properties made representations or insinuations concerning its solvency that might have dispelled any concerns that OCV might have about the substitution, as in such cases as *In re Kaiser*, 791 F.2d 73, 75-76 (7th Cir. 1986); see also *Browning-Ferris Industries v. Ter Maat*, 195 F.3d 953, 959-60 (7th Cir. 1999) (Illinois law). (Whether there were such representations by Roti is an issue in OCV's other claim, the one not before us.) A person who hails a taxi, or takes a Holiday Inn van to the airport, is not in a position to determine whether he is dealing with a solvent entity. But a person who signs a contract after months of negotiation is in a position to determine whether his counterparty is solvent, and if he makes no effort to do so, though not deflected from doing so by representations by the party he's negotiating with, he's on weak ground complaining if the other party turns out to be insolvent. True, OCV thought Markwell Properties had at least one asset—the hotel—but it made no inquiry concerning the liabilities it might have. In fact the hotel's liabilities overwhelmed its assets, for remember that when Markwell Properties signed the contract with OCV, the hotel's true owner (Markwell Hillside) was only days away from bankruptcy.

Whether, had Roti told OCV that Markwell Properties was solvent, OCV would have been justified in relying on the truth of the statement without conducting any investigation is an interesting question. See, e.g., *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 138-39 (7th Cir. 2011) (Illinois law); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675-76 (7th Cir. 1995) (ditto); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th

Cir. 1990) (ditto). But it is a question in the proceeding in the district court on OCV's separate fraud claim. A different question, the question we've just been discussing, is whether in the absence of any such statement OCV could rely on Markwell Properties' being solvent without making any inquiry. We are skeptical, but needn't decide definitively. We've explained that OCV failed to make a case for piercing the veil that separated the two Markwell companies from the defendant.

We add for completeness that it is merely conjecture that OCV was harmed by the substitution of Markwell Properties for Markwell Hillside in the contract. OCV's ability to collect the $261,058.31 in damages for breach of contract may not have been affected at all. The payments to it would have stopped at the same time and its loss would have been identical. The only difference is that it could have filed a claim in the Markwell Hillside bankruptcy for damages as an unsecured creditor. But there is no indication of how unsecured creditors fared in that bankruptcy—often of course unsecured creditors fare very badly in bankruptcy. And there is no suggestion that Roti bears any responsibility for Markwell Hillside's bankruptcy or did anything to diminish the assets available to creditors.

So we reverse the judgment in favor of OCV on its veil-piercing claim and direct the district judge to dismiss the claim with prejudice because OCV does not contend that Roti was personally enriched by his failure to observe proper corporate formalities. He received a salary from Markwell Hillside but there is no indication

that it was excessive or that it prompted Roti's decision to substitute Markwell Properties for Markwell Hillside in OCV's video-services contract.

Roti, however, complains not only about the judgment in favor of OCV that we are reversing but also about the dismissal of his "personal counterclaim" (and associated affirmative defenses to OCV's veil-piercing claim) for fraud. He claims that OCV induced him to sign the video-services contract as the representative of Markwell Properties by promising not to seek to hold him personally liable on the contract. The district judge dismissed the counterclaim on the ground that it was a compulsory counterclaim that Markwell Properties was required to have filed in OCV's suit in Colorado. But Roti wasn't a party to that suit. And anyway it's not really a counterclaim. It is a defense to OCV's suit against him, and a superfluous defense so far as piercing the veil is concerned, since we are ordering that claim dismissed on another ground. What bearing the dismissal of the "counterclaim" and affirmative defenses may have on OCV's fraud claim, which remains pending in the district court, is outside the scope of this appeal

Roti also asks that we direct that the case be assigned to another judge, pursuant to Circuit Rule 36. That too is an inappropriate request. We are not remanding the case, and we have no jurisdiction over the part of the case that remains pending in the district court.

REVERSED.