In the

# United States Court of Appeals
### For the Seventh Circuit
———————

Nos. 05-2394, 06-1481, 06-2456

MARSEILLES HYDRO POWER, LLC,

*Plaintiff-Appellee*,

*v.*

MARSEILLES LAND AND WATER CO.,

*Defendant/Third-Party Plaintiff-Appellant,*

*v.*

ILLINOIS POWER CO., and
INTERNATIONAL PAPER CO.,

*Third-Party Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 00 C 1164 & 04 C 1427—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED SEPTEMBER 5, 2007—DECIDED FEBRUARY 28, 2008

———————


Before EASTERBROOK, *Chief Judge*, and WOOD and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.*

> *. . . The gaps I mean,*
> *No one has seen them made or heard them made,*
> *But at spring mending-time we find them there.*[1]

In the spring of 2000, a gap opened in one wall of a water canal in Marseilles, Illinois, causing the wall to collapse partially. This incident gave birth to a long-running dispute between Marseilles Land and Water Company ("the canal company") and Marseilles Hydro Power LLC ("the power company"); that lawsuit has already made one trip to this court. See *Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.*, 299 F.3d 643 (7th Cir. 2002). The parties are fighting over who has the right to receive rents for the water running through the canal and who was responsible for keeping the wall in good repair. Along the way, they have argued over land deeds, obligations to provide subjacent support, and certain indentures governing the rights and duties associated with the canal. Three other parties have been swept into the fray.

Four years into the dispute, the power company filed an eminent domain action in which it sought to condemn all of the canal company's rights in the canal, in the water, in the surrounding land, and under the indentures. Third-party claims, crossclaims, and third-party crossclaims were thrown into the hopper. The original and eminent domain cases became so entangled that the district court accidentally, but understandably, entered a partial judgment in one case under the wrong docket number. Eventually, the court reached a final judgment in the eminent domain case,

---

[1] Robert Frost, *Mending Wall*, in *North of Boston* (Bartleby.com 2d ed. 1999). All citations are to this edition, which is online at http://www.bartleby.com/118/2.html (last visited Feb. 7, 2008).

and it certified partial final judgments for two parts of the original case under FED. R. CIV. P. 54(b).[2] The net result is the consolidated appeals now before us. We affirm the judgments of the district court.

## I

The procedural history of this case was first called "long and complex" back in December 2005. *Marseilles Hydro Power Co. v. Marseilles Land & Water, LLC*, 2005 U.S. Dist. Lexis 34103, *4 (N.D. Ill., Dec. 16, 2005). Since then, matters have gotten worse. We summarize the high points for the convenience of the reader.

In 1876, the canal company received a charter from the Illinois General Assembly to build a dam on the Illinois River in Marseilles. In 1910, the canal company entered into an agreement with Eugene Chubbuck, the owner of a building next to the river, to supply water and maintain the canals in return for monthly rents in specified amounts (the "1910 Indentures"). When Illinois Power

---

[2]   All references to the Federal Rules of Civil Procedure will be to the version that took effect on December 1, 2007. The Committee Note to Rule 54 reflects a general point about the 2007 rules: "The language of Rule 54 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only." The Order of April 30, 2007, issued by the Supreme Court in connection with the adoption of the 2007 Rules stated the revised rules "shall govern in all proceedings . . . commenced [after December 1, 2007] and, insofar as just and practicable, all proceedings then pending." We see nothing in the rules implicated by the present appeal that would prevent the application of the new rules in this case.

succeeded Chubbuck in 1924 and began to use the building for providing electrical power, the agreement was amended ("1924 Indentures"). The power plant was decommissioned in 1988 or 1989 and was conveyed to the power company in 1999; soon thereafter, the power company also acquired the interests in the Indentures. Noting that the canal had fallen into disrepair, the power company ceased paying rents to the canal company in early 1999.

This decision prompted the first, more complex lawsuit, to which we refer in this opinion as the original case (No. 00 C 1164). In February 2000, the power company sued the canal company for failing to keep the canals in good repair and slander of title. But "[s]*omething there is that doesn't love a wall,/That wants it down.*" The retaining wall collapsed in April 2000, not long after the power company allowed the water to drain from the North Race (one of the two major parts to the canal).

In March 2003, after the trip to this court noted earlier, in which we vacated an injunction that authorized the power company to enter upon the canal company's property to repair the wall, the original case continued. The canal company counterclaimed for trespass and negligence and asserted third-party claims against Illinois Power, Field Container ("Field"), and International Paper. According to the canal company, Illinois Power is responsible for the collapse of the wall, because its power lines and guywires put too much tension on the structure. Field and International Paper were liable, it claimed, based on their alleged ownership of the wall, which was supposedly reflected in deeds of sale in 1991 and 1996 (the "Deeds"), and their failure to maintain it. In August 2003, the court dismissed International Paper from the lawsuit.

Right after International Paper left the picture, the power company received a license from the Federal Energy Regulatory Commission to recommission the power plant. This prompted it to file a second suit in February 2004, to which we refer as the eminent domain case (No. 04 C 1427), in which it sought to take the canal by eminent domain under the power granted to it by 16 U.S.C. § 814.

Both the power company and the canal company had filed cross-motions for summary judgment in the original case before the eminent domain action began. In May 2004, the district court ruled on some of those motions, concluding that the power company was a successor-in-interest under the Indentures and holding in its favor on several other issues related to the Indentures. The summary judgment did not resolve the entire dispute, however, and some of the motions lingered.

In June 2004, the canal company threatened to open the head gates to the river and flood the North Race, which had been dry since 2000. The power company secured a temporary restraining order in the eminent domain suit against such an action, but the canal company defied the order and literally opened the floodgates. This prompted Field to file a third-party counterclaim against the canal company for trespass in the original case.

The eminent domain case was resolved first, when the court entered final judgment in the power company's favor in January 2005. It awarded all of the requested land and rights to the power company and set compensation for the taking at $168,750. The canal company's appeal from that judgment, No. 05-2394, is one of the three now before us.

In October 2005, the third-party claims against Field and Illinois Power in the original case were dismissed as

untimely under the statute of limitations for property damage. Unfortunately, the court accidentally entered that order under the docket number assigned to the eminent domain case, No. 04 C 1427. The district court also resolved the questions of who owned the retaining wall and who was responsible for certain obligations under the Indentures in favor of Field and Illinois Power and against the canal company. By May 2006, the court had corrected the mistaken docket entry and recorded its decision in the proper place (that is, No. 00 C 1164). At that point, however, it mistakenly cited 28 U.S.C. § 1292(b) in its effort to certify these rulings for immediate appeal. The canal company filed the second appeal before us, No. 06-1481, in order to challenge the court's decision that the statute of limitations barred its claims against Field and Illinois Power. It filed yet a third appeal, No. 06-2456, from the district court's resolution of the issues of ownership of the retaining wall, naming Field and International Paper as appellees, and obligations under the Indentures, naming the power company as appellee.

In April 2007, the parties agreed to dismiss Field from the original case voluntarily. This left the original litigants, the power company and the canal company, and two of the third-party appellees, Illinois Power and International Paper. Another third-party defendant, North American Hydro, is party to some claims that have not been finally adjudicated, and is not before this court.

## II

Before reaching the other issues, a jurisdictional question looms: is appellate jurisdiction proper over the appeals from orders entered in the original case? In attempting

to certify the cases we have docketed as Nos. 06-1481 and 06-2456 as ready for immediate appeal, the district court cited 28 U.S.C. § 1292(b), which is for "a controlling question of law as to which there is substantial ground for difference of opinion." Neither of the cases fits that standard, because both also purport to be from a final judgment and deal with issues of fact as well as issues of law. Further, the district court did not "state [the appropriate reasons] in writing in [its] order." *Id.* Finally, no one asked this court to accept the appeals, either within the requisite ten days given by § 1292(b) or otherwise. One thing, therefore, is certain: these are not, and cannot be, proper interlocutory appeals.

Looking beyond the labels, however, we can see that the district court made the findings necessary to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties." See FED. R. CIV. P. 54(b). First, it resolved particular claims, which we describe in more detail below. Second, in keeping with the requirement of Rule 54(b) to make an express determination that "there is no just reason for delay," the court prepared final judgment forms in which it explicitly made that finding. The district court's orders were, as the pre-2007 version of Rule 54(b) required, entered on the docket. We are satisfied that the mention of § 1292(b) was a slip of the pen, and that in substance we have the certifications required by Rule 54(b).

That finding, however, raises a second question: were the orders in question eligible for treatment under Rule 54(b)? Assuming that counsel correctly represented that all claims concerning International Paper and Illinois Power have been resolved in the district court, the answer is yes, because the rule authorizes certification when everything having to do with a particular party is wrapped

up. If any loose ends remain with one or the other company, certification is still appropriate if certain claims have finally been resolved. That requires a somewhat more complex inquiry. If an examination of the record reveals that the claims on appeal are too similar to the issues remaining in the district court, then we would have to conclude that there was no partial final judgment of the sort contemplated by the rule. In such a case, we would have no jurisdiction to entertain the appeal. See *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 235 F.3d 360, 365 (7th Cir. 2000). When a district court invokes Rule 54(b), we have an independent obligation to ensure that its decision on a given claim is indeed a final one. See *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7-8 (1980). We must also decide whether the district court abused its discretion in determining that there was no just reason for delay. *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.*, 860 F.2d 1441, 1443-44 (7th Cir. 1988). Both questions involve consideration of the factual relation between the issues that have been resolved and those that remain. *Id.* at 1444 n.3 (quoting *Curtiss-Wright*, 446 U.S. at 8, 10) (noting that the standard of review for the separateness inquiry was left ambiguous).

There are no bright-line rules for determining whether two claims are separate for Rule 54(b) purposes, but we find some guidance in *Amalgamated Meat Cutters & Butcher Workmen v. Thompson Farms Co.*, 642 F.2d 1065, 1070-71 (7th Cir. 1981). "At a minimum, claims cannot be separate unless separate recovery is possible on each. . . . Hence, mere variations of legal theory do not constitute separate claims. . . . Nor are claims so closely related that they would fall afoul of the rule against splitting claims if brought separately. . . ." *Id.* This inquiry involves compar-

ing the issues at stake in the appealed claims and those remaining in the district court, *American Cyanamid*, 860 F.2d at 1444, and determining whether there is a "significant factual overlap," *Automatic Liquid Packaging, Inc. v. Dominik*, 852 F.2d 1036, 1037 (7th Cir. 1988). In the course of this examination, we bear in mind that the rule defines a class of final judgments, suitable for appeal under 28 U.S.C. § 1291. The scope of Rule 54(b) must therefore be confined to "situations where one of multiple claims is fully adjudicated—to spare the court of appeals from having to keep relearning the facts of a case on successive appeals." *American Cyanamid*, 860 F.2d at 1444 (quotation omitted). "[I]f there are different facts (and of course different issues) consideration of the appeals piecemeal rather than all at once will not involve a duplication in the efforts required of the judges to prepare for argument in, and to decide, each appeal." *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984). Even if two claims arise from the same event or occurrence, they may be separable for Rule 54(b) purposes if they rely on entirely different legal entitlements yielding separate recoveries, rather than different legal theories aimed at the same recovery.

Although, in the case before us, many of the claims on appeal and some still pending in the district court stem from the same occurrence—the collapse of the retaining wall in April 2000—the issues raised in each part of the case are legally distinct and involve different facts. The case as a whole includes the following claims, all brought by the canal company: (1) a set arising under property law, based on the removal of lateral support by the draining of the North Race, filed against the power company and North American Hydro, both still in the district court; (2) claims in tort against Illinois Power, which have

been resolved and are now on appeal; and (3) a pair of claims against Field and International Paper based on an interpretation of a deed, which have been finally resolved and are the subject of one of these appeals.

The last of those three is easiest to recognize as fully separable from the rest of the case. That part of the original litigation raised the question whether the 1991 and 1996 Deeds did or did not convey the offending wall. The set of tort claims against Illinois Power are also factually and legally distinguishable from those alleged against the power company and North American Hydro. The canal company's complaint against Illinois Power ultimately concerns the guywires that Illinois Power attached to the retaining wall and a light pole that supposedly caused subsidence behind the retaining wall. The district court found these claims barred by the statute of limitations; it did not reach the merits. The issues at stake in the inquiry into timeliness bear little or no relation to the causation inquiries needed to assess the claims against the power company and North American Hydro, even though they arise from the same injury. Compare *Fitigues, Inc. v. Varat Enterprises, Inc.*, 813 F. Supp. 1336 (N.D. Ill. 1992) (separating review of an arbitration award from the rest of a contract dispute because the issues involved in the former were confined by statute).

Even if we look behind the statute of limitations to the underlying factual overlaps, see *Minority Police Officers Assn. v. South Bend*, 721 F.2d 197, 201 (7th Cir. 1983), the claims against Illinois Power and those against the power company and North American Hydro arise from different sets of facts occurring in different periods invoking different legal regimes. The claims against Illinois Power arise from the allegedly negligent construction of

improvements in 1960 and 1994. The claims against the power company and North American Hydro all relate to the draining (or, as the parties call it, "dewatering") of the North Race in 2000, because this action allegedly destroyed the lateral support for the wall (a question of property law). The periods covered by the two claims also differ considerably. While there will be some overlapping historical facts, a panel hearing an appeal from a final decision on the claims still pending before the district court (group 1 above) will not have to rehash the same issues as we have had to investigate for this appeal. We conclude, therefore, that the ownership and tort claims now before us in Nos. 06-1481 and 06-2456 are sufficiently distinct from the remainder of the case that the use of Rule 54(b) is appropriate.

From here the rest of the inquiry falls into place. The district court did not abuse its discretion in certifying that there was "no just reason for delay" under Rule 54(b). We thus turn to the merits in both the eminent domain appeal, No. 05-2394, and the two Rule 54(b) appeals.

## III

### A.  Eminent Domain

The eminent domain case can be broken down into three parts: whether the taking was necessary (as specified in the statute), whether the scope was proper, and whether the court assessed compensation appropriately. As this judgment was entered after a full trial to the court, we review any findings of fact for clear error only, see FED. R. CIV. P. 52(a)(6), and we give *de novo* review to the court's legal rulings.

1. Necessity

Under the Federal Power Act, 16 U.S.C. § 814, a FERC licensee may "exercise . . . the right of eminent domain" "[w]hen [it] can not acquire by contract or pledges . . . the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto . . . ." *Id.* Absolute inability to acquire the property is not required; the statute contemplates merely the failure of a *bona fide* effort to acquire the rights through contract. See *Wilson v. Union Elec. Light & Power Co.*, 59 F.2d 580, 581 (8th Cir. 1932).

The power company acquired its FERC license in November 2003. Although it did have some rights under the Indentures—specifically to use water flowing through the canal for generating power—it contended that those rights were rendered effectively useless by the bad repair of the canal. It also alleged that the canal company failed to uphold its side of the Indentures when it did not repair the canal or the collapsed retaining wall. This stubbornness, the power company claimed, made condemnation necessary. The canal company, for its part, disagreed, arguing that the power company never really engaged in any sincere negotiation, instead offering pittances as compensation (in order, the canal company accused, to "steal" its assets). Intending to demonstrate how wrong the power company was about the usability of the canals, the canal company violated a temporary restraining order in June of 2004 by flooding the North Race.

The district court found that the canal was not in working order (a finding that was not shaken by the unauthorized flooding). *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 2004 U.S. Dist. Lexis 9849, *30 (N.D. Ill. 2004).

Although it is possible that the flooding might have created some evidence that the canal was useable, in the end the district court was entitled to place more weight on the light the act of flooding shed on the canal company's unwillingness to negotiate, and thus the need for eminent domain. The flooding is indicative of a party who will accept a bargain only on its terms. This perception is fortified by the canal company's own (denied) filing with FERC, which stated that the property, including the canals, "[wa]s not available to [the power company] on a volitional basis." See Order on Reh'g, 107 FERC ¶ 61,066 n.9 (Apr. 20, 2004). This statement makes it clear that no amicable resolution was forthcoming. Further, the existence of the original suit was premised on the power company's efforts to exercise its right under the Indentures to force the canal company to repair the canals. The canal company's decision to resist that demand (even through a lawsuit) indicates an unwillingness to perform. There was no clear error in the district court's factual finding that the use of eminent domain was reasonably necessary whether or not the canal was actually completely unusable, because the use of the canals could not be acquired from the canal company "by contract or pledges."

### 2. Scope

The district court has already analyzed why each portion of the property to be condemned was necessary for the operation of the power plant. See *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 2004 U.S. Dist. Lexis 25276, *7-13 (N.D. Ill. 2004). The fact that the court did not give the power company everything it wanted reflects the care it gave to this question. We do not

need to rehearse its findings in detail here, for nothing was presented to us that would indicate any clear error.

The canal company argues instead that the power company should take none of the rights appurtenant to the property, only the real estate itself, because it asked only for rights related to streets and alleys abutting the property. This could be true only if one reads the eminent domain complaint selectively. Paragraph (a) asks for "[f]ull and clear fee simple title to the Premises, including all improvements thereon and all interests therein and rights incident thereto of every kind and nature . . . ." Paragraph (b) reinforces the broad sweep of Paragraph (a) by separately asking for the rights to the abutting streets and alleyways.

The canal company next asserts that some lesser property right would suffice, such as a license to use the water or an easement. On the facts found by the district court, this argument cannot prevail. Part of the court's determination was that the power company had demonstrated its need for a full-blown acquisition of the property; a lesser interest would not do. Based on this record, we find no clear error in that decision.

### 3. Compensation

Most of the dispute here is about the proper method for valuation of the rights and properties at stake. The canal company argues that the court improperly excluded evidence from its expert, David Moody. This court reviews the question whether the district court properly interpreted FED. R. EVID. 702 *de novo*, and its ultimate decision to admit or exclude for abuse of discretion. See *United States v. Allen*, 269 F.3d 842, 845 (7th Cir. 2001).

We do not need to review the question whether Moody's testimony should have been admitted or not because, if there was error at all, we are satisfied that it would be harmless. In a trial to the court (as this was), the district judge is entitled to weigh the testimony, even if admitted, at his or her discretion. Here, the judge would not have abused his discretion if he had admitted the testimony and then had weighed it lightly. The court laid out the reasons why it found each of the parties' experts to be more or less credible. See *Marseilles Hydro Power*, 2004 U.S. Dist. Lexis 25276 at *17-27. It then analyzed the value of each section of the property and came up with a number much higher than what the power company offered, but lower than the canal company's demand. *Id.* at *25-30. Far from an abuse of discretion, this was a reasonable approach to take in the face of widely varying estimates.

Furthermore, the district court recognized a limitation on value that the canal company did not: the Indentures limit the value of the water rights. The canal company cannot get a higher price for the water without breaking the contract. Thus, any valuation that presumed free use of the water would be inherently flawed, as the judge recognized. See *id.* at *21-24. To the extent that somebody else could extract a higher value from the water, that would suggest that the highest and best use of the property is not what the canal company was proposing. Compensation in eminent domain cases is only for the value lost to the owner, not the benefit gained by the condemnor. *United States v. Miller*, 317 U.S. 369, 375 (1943) (describing compensation as "no more than indemnity for [the landowner's] loss"). The value of the taking could not be measured by how the property might be used by a hypothetical third party; it is only the value of what was lost to the condemnee. That

value, in turn, was limited by the terms of the Indentures. In short, we conclude that the district court's findings with respect to the necessity, scope, and valuation of the taking were not clearly erroneous.

### B.  Statute of Limitations

The second appeal before us, No. 06-1481, is from the dismissal of Field and Illinois Power from the suit on statute of limitations grounds. We review this decision *de novo*. *Jones v. GE*, 87 F.3d 209, 211 (7th Cir. 1996). Because Field has been dismissed from the suit by consent, this issue is moot with respect to it. We will consider the statute of limitations only as it bears on the injury allegedly caused by Illinois Power.

The parties dispute which statute of limitations should apply. The power company argues for Illinois's four-year statute of limitations governing damage arising from negligent construction of improvements, 735 ILCS 5/13-214(a); the canal company would prefer the five-year general limitations period on property damage, 735 ILCS 5/13-205. A number of consequences flow from the choice of statute. The four-year statute contains an explicit clause stating that the clock starts when the injured party "knew or should reasonably have known" of the injury. 735 ILCS 5/13-214(a). It also contains a ten-year statute of repose. 735 ILCS 5/13-214(b). The five-year statute, in contrast, does not have either provision, and the cause of action has been held to accrue on the date of injury, *Ill. Nat'l Bank & Trust v. Rockford*, 92 N.E.2d 166, 169 (Ill. 1950).

As we noted earlier, the canal company's claims against Illinois Power arise from guywires that Illinois Power

attached to the retaining wall in 1960 and a light pole it installed in 1994. The former applied pressure to the retaining wall, while the latter accidentally broke a drain-pipe, thereby allowing rainwater to wash away the soil behind the wall, causing subsidence. In either case, the injury was caused by construction of an improvement. Where two statutes of limitations might apply, Illinois courts instruct that we should apply the more specific one. See *Commonwealth Edison v. Walsh Constr. Co.*, 532 N.E.2d 346, 350 (Ill. App. Ct. 1988) (construing § 3-214 as an exception to the general statute of limitations for property damage in § 3-205). The district court found that the shorter four-year statute of limitations applies here, and we agree.

Because the four-year statute applies, so does the discovery rule written into it. The district court found that a letter from the power company to the canal company in June 1997 marked the date of notice. The canal company objects that the letter, written by a lawyer, was inadmissible hearsay. That is incorrect: it is not hearsay if it is used only to show notice. See FED. R. EVID. 801(c) and 1972 Advisory Cmte. Notes ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). At the latest, therefore, the clock began to run in June of 1997. That clock expired in 2001, well before Illinois Power was joined as a third-party defendant.

We need not consider the question whether the harm alleged was a continuing injury or a continuing tort, nor the (rather strong) arguments for an earlier date of accrual. At the latest, the suit should have been brought by June 2001, and it was not. The claims against Illinois Power were time-barred and therefore properly dismissed.

C. Deeds

The third appeal, No. 06-2456, deals with the final two issues: interpretation of the 1991 and 1996 Deeds, which determine who owns the wall, and the rights and obligations due each party under the Indentures.

The parties agree that the canal company conveyed the land next to the wall ("the Reserve") to Federal Paper Board Co. (International Paper's predecessor-in-interest) by quitclaim deed in 1991. Federal Paper Board then conveyed the Reserve to Field in 1996 by warranty deed. What is disputed is whether the wall itself was included in either or both of those transactions. The canal company argues that the wording of the 1996 Deed, explicitly excluding the wall from the conveyance, proves that the 1991 Deed *did* convey the wall to Federal Paper Board (and therefore International Paper). The canal company then argues that the 1996 Deed did not change the grant, proving that International Paper still owned the wall at the time of collapse. (*Something there is that doesn't love a wall,/That wants it down . . . .*)

The district court found that the wording of the 1991 Deed was clear. The Deed conveyed "[a] strip of land 30 feet in width, more or less, . . . bounded on the east by the west right-of-way line of Main Street, on the south by [described properties], . . . on the west by a line [parallel to a certain lot], and on the north by the south wall of the north head race. . . ." This, the court found, indicated beyond any doubt that the parcel conveyed was bounded by the wall, but that it did not include the wall. The court also focused on the words "more or less," which it noted are "used as words of precaution and safety and are intended to cover unimportant inaccuracies." 23 Am. Jur. 2d Deeds § 258. We, too, find this reading compelling. The 1991 Deed, at least, conveyed the Reserve, but not

the wall, to International Paper's predecessor, leaving the wall in the canal company's hands.

The canal company resists this conclusion by pointing to the 1996 Deed, which explicitly excludes the wall from the description of the property (the "north property line is the south face of the wall"). It argues that this wording raises the inference that the 1991 Deed may be ambiguous after all because it was not as precise. The flaw in the canal company's argument is timing: a later deed cannot render an earlier deed ambiguous. See *Mann v. Mann*, 671 N.E.2d 73, 76 (Ill. App. Ct. 1996); *Green Bay and Miss. Canal Co. v. Hewett*, 12 N.W. 382, 383-84 (Wis. 1882) ("This is an application of the ancient rule or maxim that 'the first deed and the last will shall operate.'"). Although external circumstances can render a deed latently ambiguous, it must be so when written, even if the parties only discover it later on. In 1991, there were no discoverable external circumstances that rendered the deed ambiguous: the ambiguity-creating document would not exist for another five years. The district court correctly found, as a matter of law, that the 1991 Deed governed and was unambiguous within its four corners; the 1996 Deed was a separate document by a separate grantor and did not retroactively muddy up the earlier document. (We note in passing the perverse consequences an alternative ruling would have. Artful drafting of a later deed would allow a landowner to divest herself of land without actually conveying it, a ploy that could come in very handy if the plot of land were, for instance, contaminated.)

On appeal, the canal company also raises a rule of deed construction for artificial monuments, arguing that the property line should, as a matter of law, be measured to the midpoint of the wall (meaning that the 1991 Deed con-

veyed at least the half of the wall facing the rest of the Reserve). The district court invited the canal company to present other deeds showing alternative ownership, but it instead submitted only a surveyor's affidavit. It never mentioned the artificial-monument rule to the district court. This court will not split the wall in two in such an odd way: because this argument was not raised before the district court, it is waived. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (citing *Heller v. Equitable Life Assurance Soc'y*, 833 F.2d 1253, 1261-62 (7th Cir. 1987) ("On numerous occasions we have held that if a party fails to press an argument before the district court, he waives the right to present that argument on appeal. . . . As we have made clear, it is axiomatic that arguments not raised below are waived on appeal.") (citations and quotation marks omitted)). We agree with the district court that the canal company owned the retaining wall at the time of collapse.

D.  Indentures

Last of all, we come to the first issue raised in the original suit: whether the Indentures have been broken, if so by whom, and what rights and obligations each party has as a result. Whether the Indentures are characterized as contracts or leases, the standard of review is *de novo* as long as the writing is unambiguous; if there is ambiguity, review is more deferential. *Platinum Technology, Inc. v. Federal Ins. Co.*, 282 F.3d 927, 930-31 (7th Cir. 2002); *HA-LO Industries, Inc. v. CenterPoint Properties Trust*, 342 F.3d 794, 797 (7th Cir. 2003).

The canal company argues that the Indentures are like leases. This means, it urges, that the power company's duty to pay rents continued regardless of the state of repair of

the canal. The power company, naturally, contends that they were more like contracts and the duty to pay was excused once the canal company breached its obligation to keep the canal in good repair. We prefer to put this characterization debate to one side and to begin by examining the text of the Indentures directly.

This saves a great deal of time, as it turns out that the Indentures are not ambiguous at all on the question of the ongoing duty to pay rent. The district court correctly noted that the canal company could not terminate the Indentures for nonpayment of rent until the deficiency had been reduced to judgment. *Marseilles Hydro Power*, 2004 U.S. Dist. Lexis 9849 at *17-18. Paragraphs 26 and 27 of the 1924 Indentures allow the canal company to shut off the flow of water after 90 days' delinquency, but it is permitted to cancel the Indentures only if the power company is 90 days in arrears on a final judgment. The Indentures, on their face, grant the canal company only one self-help remedy: shutting off the flow of water. The alternative remedy it chose—neglecting repairs—was not authorized.

In fact, ¶ 32 of the Indentures obliges the canal company "to at all times keep [the premises] in good repair and condition . . . so as not to impair the free use and enjoyment of the water power hereby leased." This provision places no condition on the canal company's obligation to keep the canals in good working order. Whether characterized as leases or contracts, the Indentures explicitly require the canal company to maintain the canal regardless of whether rent is current.

Paragraph 19 of the Indentures allows a rebate of rent paid if the canal is not in working order for more than 10 days in a year. The canal company attempts to argue that the power company should be obliged to pay rent, and then the canal company would simply return the

payment a year later as a rebate. It makes no sense to us, however, to read the Indentures as mandating an interest-free loan of this sort to a party that is already in breach of the agreements.

An alternative approach to the Indentures rests on the question whether the power company succeeded to all of the rights and obligations of the canal company in the Indentures. *Marseilles Hydro Power*, 2004 U.S. Dist. Lexis 9849 at *9-19. The canal company was the original "party of the first part," and the power company succeeded to the "Second Party" role (that is, it was the successor-in-interest to Chubbuck) soon after taking over the power plant in 1999. The eminent domain complaint named "rights incident [to the property] of every kind and nature," which would include the rights under the Indenture, and the district court included the valuation of the rents under the Indentures in the valuation of the property. *Marseilles Hydro Power*, 2004 U.S. Dist. Lexis 25276 at *27-28. The canal company correctly observes that the Indentures effectively become void if the taking is allowed. Because we have affirmed the district court's order in the eminent domain action, the power company has succeeded to all of the rights incident to the property, including those of the canal company under the Indentures. Because it is already the "Second Party," this accession dissolves the Indentures through merger of the parties.

**IV**

*Before I built a wall I'd ask to know/What I was walling in or walling out,/And to whom I was like to give offence.* We hope that the saga of the Marseilles Canal Wall is over at last. To say that the demise of the wall was causally over-

determined would be an epic understatement. Construing all facts in the light most favorable to the canal company, the pressure from Illinois Power's guywires torqued it, the weight of National Biscuit Co.'s trucks in the parking lot above squashed it, the dewatering of the canal by the power company and North American Hydro removed its support on one side, and the damage from Illinois Power's light pole allowed Field's drainage problems to erode the support on the other—all for over thirty years after the canal company's president noticed that the wall was leaning but concluded it wasn't his problem because it wasn't his wall.

The prospect of sorting out liability in a case like this is precisely why there are statutes of limitations: evidence is so stale and causation is so tenuous that it is no longer possible to render any judgment soundly based on fact. The canal company's defiant action in flooding the North Race did not help its cause either. It illustrates why the necessity of a taking can be shown by the failure of *bona fide* efforts to contract and not only by an absolute inability to acquire the property. The attempt to introduce a retroactive ambiguity into the 1991 Deed shows why deeds are construed within their four corners first, and why the first deed governs. The district court is certainly up to the task of finishing off the few issues that remain, though sometimes, we admit, stones are not so easy to keep stacked: *And some are loaves and some so nearly balls/We have to use a spell to make them balance:/"Stay where you are until our backs are turned!"*

In the spirit of piling stone upon stone in order to help the district court finish the task before it, we AFFIRM the district court's judgment in No. 05-2394, the eminent domain case. We also AFFIRM the dismissal of Field

and Illinois Power under the statute of limitations in No. 06-1481. Finally, we AFFIRM the district court's conclusions in No. 06-2456, that the canal company owned the wall at all relevant times, that the rights and duties of the "party of the first part" to the Indentures belong to the power company, and that if any party was in breach of the Indentures it was the canal company. The power company, we have found, owes no rents.