In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3723

FUSION CAPITAL FUND II, LLC,

*Plaintiff-Appellee*,

*v.*

RICHARD HAM and CARLA AUFDENKAMP,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4543—**Milton I. Shadur**, *Judge*.

ARGUED JUNE 2, 2010—DECIDED AUGUST 2, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER and
KANNE, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  Millenium Holding Group,
Inc., has shares that were registered under the Securities
Act of 1933 and are traded over the counter. It also has
few assets and is insolvent. In 2004 its assets came to
$60,000 and its liabilities to $1.5 million; things have not
improved since. Millenium does not have any ongoing
business, though it does have a professionally designed
web site (http://www.mnhginc.com/millenium.html).

In July 2004 Millenium and Sutura, Inc., a firm that *does* have a business (it makes and sells medical devices), signed a merger agreement. What Sutura, a privately held firm, saw in Millenium was its tradable stock. Sutura wanted to go public without all the fuss and bother (and expense) of a registration statement and the release of audited financials. The proposed transaction—a reverse merger in which an operating company (Sutura) merges into a shell (Millenium), which then changes its name to match the operating company's—is known to securities lawyers as "going public by the back door." The SEC treats these transactions with disdain, but they are not illegal. (We need not get into the complex issues that may arise when a shell goes public as part of a plan to facilitate the later distribution of another company's stock. No one contends that there was any legal problem with the transaction between Sutura and Millenium, whose stock had traded for more than five years before the merger was arranged.)

Sutura wanted new equity capital, and Millenium promised to sell enough stock to raise at least $15 million. Fusion Capital Fund II agreed to be the financial angel. Fusion and Millenium signed a contract by which Fusion promised to invest $15 million, subject to certain conditions—including consummation of the merger. When the merger had not closed by October 31, 2004, Fusion wrote to Millenium that the money would not be forthcoming. Millenium could not find a replacement source of capital, and Sutura then terminated the merger agreement. (Sutura eventually went public by merging

with Technology Visions Group, Inc., another shell with tradable shares.)

Millenium sued Fusion in Nevada, contending that Fusion had tortiously interfered with the merger agreement. (Millenium is incorporated in Nevada and has its principal place of "business" there, which accounts for the choice of venue.) After two years of litigation, the court ruled in Fusion's favor. The contract between Fusion and Millenium requires it to pay Fusion's legal fees, and Fusion filed suit in a federal court in Illinois seeking a judgment under that clause. The parties have agreed that Fusion did not need to raise that issue in the Nevada proceedings. The litigation comes within the diversity jurisdiction. (Fusion is a limited liability company; all of its members are citizens of Illinois.)

A claim against Millenium isn't worth the cost of mailing it to the courthouse, however, because Millenium is so far under water. Fusion needs a solvent obligor. It chose Richard Ham and Carla Aufdenkamp, who own a majority of Millenium's stock and are its sole board members and managers. (Ham and Aufdenkamp, citizens of Nevada who are married, call themselves "the Hams"; we do likewise.) Fusion sued the Hams as well as Millenium. The district court held that Millenium owes Fusion about $1.2 million for legal outlays, 590 F. Supp. 2d 1055 (N.D. Ill. 2008), and added that the Hams are personally responsible for Millenium's debt to Fusion. 2009 U.S. Dist. LEXIS 65002 (N.D. Ill. July 28, 2009). The Hams appeal; Millenium does not.

Because Millenium is incorporated in Nevada, that state's law determines whether its investors are liable

for its debts. (This is an aspect of the internal-affairs doctrine, a choice-of-law rule to which Illinois adheres. See *Libco Corp. v. Roland*, 99 Ill. App. 3d 1140, 1144, 426 N.E.2d 309, 312 (1981).) The contract also contains a choice-of-law clause specifying Nevada law for issues concerning Millenium and its stockholders. Nevada has a law for this subject:

> 1. Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.
>
> 2. A stockholder, director or officer acts as the alter ego of a corporation if:
>
> > (a) The corporation is influenced and governed by the stockholder, director or officer;
> >
> > (b) There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and
> >
> > (c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

Nev. Rev. Stat. §78.747. Earlier decisions had devised a similar approach as a matter of common law. See, e.g., *Ecklund v. Nevada Wholesale Lumber Co.*, 93 Nev. 196, 197, 562 P.2d 479, 479–80 (1977). These decisions all speak of "fraud or injustice" as the third element; the statute, enacted in 2001, refers to "manifest injustice" rather than

simple injustice. Nevada's judiciary has not decided whether there is a difference; we needn't do so either.

The district court concluded that the Hams influence and govern Millenium; they concede this point on appeal. The district court also found that there is a unity of interest between the Hams and Millenium, making them inseparable as a practical matter, and that finding is amply supported. Millenium has scant existence apart from the Hams. It does not have significant assets, does not observe corporate formalities (its bylaws require at least three directors, but the Hams are the only members of its board); does not have audited financial statements; and does not file tax returns. Millenium's corporate headquarters is the Hams' residence (which they "rent" from Millenium, in exchange for forgiveness of "salaries" that they have not earned, after advancing the funds that Millenium uses to lease the house from a third party).

As for the third element: there isn't any fraud, because Fusion knew that Millenium is a husk without any corn inside. See *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991) (Illinois law). And this knowledge also makes it hard to see how limiting the Hams' liability would produce an "injustice," manifest or otherwise. Fusion was not deceived, hornswoggled, misled, duped, hoodwinked, bamboozled, or snookered. The "injustice" component comes to the fore when a creditor's claim is based on tort law, because victims rarely understand in advance that they are dealing with shell corporations (if indeed they understand

before the injury that they are dealing with anyone at all). It may be important for some contract claims too, if the corporation leads the other party to think that it is normally capitalized and will be able to satisfy its obligations. See, e.g., *Carson Meadows, Inc. v. Pease*, 91 Nev. 187, 533 P.2d 458 (1975). But Fusion not only understood that Millenium was a shell but also knew that its shell status was exactly why it was attractive to Sutura, and why Millenium couldn't put up any of the $15 million. Millenium's thin capitalization was both the reason why this deal had been proposed and the dominant feature in the deal's structure. Fusion went in with eyes open.

When Millenium signed a contract promising to reimburse Fusion's legal expenses if litigation ensued, Fusion knew beyond doubt that Millenium would be unable to keep that promise—unless the merger closed. Someone who wants to protect himself against the possibility that a thinly capitalized corporation will be unable to pay its debts asks the investors for a guaranty. It is feckless to do business with a corporation such as Millenium without one. Yet Fusion not only did not get a guaranty but also did not even *ask* for one. Its brief says that it didn't ask because it was sure the merger would close, so no additional source of funds would be required. Yet the point of a guaranty is to provide for payment if a deal goes sour. A business such as Fusion that neglects to arrange for payment if the worst comes to pass is not well positioned to seek judicial aid. What Fusion wants is an approach that gives a corporation's contracting partners the legal equivalent of a guaranty whether

the investors agree to that arrangement or not. This would reduce the options available for business transactions and make everyone worse off.

A rule such as Nev. Rev. Stat. §78.747 makes investors personally liable only in the sort of situations in which private negotiations fail—when fraud spoils the voluntariness of the choice, when the investors make net withdrawals from the corporation after the contract has been formed and thus frustrate its ability to keep its promises (a fraudulent conveyance if the corporation is insolvent, or the transfer makes it so), or when there were no negotiations (as with tort creditors) and permitting investors to insulate themselves from those claims would be unjust.

We do not know of any statute or decision, in any American jurisdiction, holding that investors in a thinly capitalized corporation are personally liable for its debts to a contracting partner when that partner, with knowledge of the corporation's insolvency, signs without getting a guaranty from the investors. The closest Nevada has come is *Mosa v. Wilson-Bates Furniture Co.*, 94 Nev. 521, 583 P.2d 453 (1978), which held that an investor who had "assured" the creditor that the investor would pay, if the corporation could not, must keep that promise. It is unclear whether the state court treated the "assurance" as a contract equivalent to a guaranty, or concluded that the investor committed fraud by inducing unwarranted reliance on an empty assurance. (Making a promise that one plans to ignore is fraud. See *The Wharf (Holdings) Ltd. v. United*

*International Holdings, Inc.*, 532 U.S. 588 (2001).) But whichever way *Mosa* is understood, it is some distance from a situation such as ours, in which the investors did not vow in advance to make good the corporation's debts.

Meanwhile, lots of decisions hold that people who knowingly deal with a corporation without getting a guaranty can't turn to investors on an alter-ego or veil-piercing theory. For a few of these decisions from Nevada, see *Paul Steelman, Ltd. v. Omni Realty Partners*, 110 Nev. 1223, 1226, 885 P.2d 549, 551 (1994); *Lipshie v. Tracy Investment Co.*, 93 Nev. 370, 377–79, 566 P.2d 819, 823–24 (1977); *O'Connell v. Cox*, 78 Nev. 40, 44, 368 P.2d 761, 763 (1962). *Ecklund*, which we cited earlier, is another decision in this line. See also *Baer v. Amos J. Walker, Inc.*, 85 Nev. 219, 221, 452 P.2d 916, 917 (1969) (refusing to hold corporation liable as alter ego of its manager because "[t]here is no proof that the credit of the corporation was relied upon by the [creditor]" when it lent money to the manager). The leading decision is *Hanson v. Bradley*, 298 Mass. 371, 10 N.E.2d 259 (1937), which as far as we can see has been followed by every state court that has addressed the subject.

The district court took umbrage at the Hams' financial maneuverings. They provide money to Millenium, which uses the cash to lease a house for the Hams' use. They put large "salaries" for themselves on the corporate books, then set off their rental obligations on the house against part of those salaries. Their salaries vastly exceed the value of the rent plus any services they provide to Millenium, which therefore sinks ever further into debt.

Since the merger fell through, they have not supplied Fusion with financial statements (leading Fusion to describe Millenium as a black box). They caused Millenium to "agree" to pay substantial rates of interest on the money they "loaned" to it (principally the unpaid "salaries"); this means even more red ink. But Fusion, which knew from the outset that Millenium was insolvent and had debts to its insiders, was not injured by any of these things. It is a matter of indifference to Fusion whether Millenium's paper losses are $1 million or $1 billion; it knew from the get-go that Millenium could not pay its debts, so the precise details of its balance sheet can't produce an "injustice" for the purpose of Nevada law. See generally Stephen B. Presser, *Piercing the Corporate Veil* §2:29 (2010 ed.) (discussing the law of investor liability in Nevada).

The district court relied principally on *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 963 P.2d 488 (1998), and *LFC Marketing Group, Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841 (2000). Neither of these decisions supports Fusion's position. *Lorenz* arose from a long-term lease. By the time 27 years had passed, the lessee had transferred its interest several times, and the latest assignee had formed a corporation to occupy the premises. That thinly capitalized corporation refused to pay or vacate; the Supreme Court of Nevada concluded that the corporation's controlling investors must pay the rent. It does not help Fusion because the lessor never dealt with the newly formed corporation. Similarly, if Millenium had been solvent when Fusion signed its contract, and the Hams had siphoned off Millenium's assets before beginning

the Nevada litigation, Fusion would have a solid claim to relief. But that's not what happened; Millenium has been insolvent from the start. As for *LFC*: Lange, a debtor, transferred assets to LFC, a corporation in which Lange's brother held all the stock. Lange's creditor could not satisfy the debt by seizing his stock in LFC, for Lange had none. The court held that LFC could be ordered to transfer the assets to Lange's creditor. That's a form of recovery for a fraudulent conveyance, and we've already explained why nothing of the kind occurred here.

Fusion hints at a different kind of "injustice": Millenium took the offensive in the Nevada suit. If it had prevailed, the Hams would have pocketed 100% of the money; now that Millenium has lost, the Hams say they owe nothing. But this asymmetry is common in corporate transactions. Equity owners want the corporation to take risks, because if the gamble pays off they reap the rewards, and if it doesn't they just walk away, and the losses will fall elsewhere (on debt investors or outsiders such as Fusion). Fusion wants to be protected from this asymmetry, but to get this protection Fusion should have negotiated for a guaranty and refused to deal if the Hams would not give one. Far better to encourage voluntary contracts than to warp the law of investors' liability, after the fact, to protect commercial entities that failed to protect themselves.

REVERSED